## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID ZDRAVETZ EVDOKIMOW,

         Petitioner,

    v.

CLAIR DOLL, *et al.*,

         Respondents.

No. 4:21-CV-00261

(Judge Brann)

## MEMORANDUM OPINION

### FEBRUARY 26, 2021

## I.    BACKGROUND

David Zdravetz Evdokimow, currently a detainee in the custody of the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE), filed this emergency 28 U.S.C. § 2241 petition, raising three distinct claims.[1] First, Evdokimow contends that his detention is unlawful, as his Final Administrative Removal Order (FARO) is defective; he thus seeks an order from this Court that vacates the FARO and orders Evdokimow released from ICE custody.[2] Second, Evdokimow argues that his continued detention without a bond hearing violates the Fifth Amendment's Due Process Clause.[3] Finally, Evdokimow asserts that, in light of the COVID-19 pandemic, his continued detention violates his

---

[1]    Doc. 1.
[2]    *Id.* at 16-22.
[3]    *Id.* at 22-24.

due process rights under the Fifth Amendment, as his detainment constitutes prohibited punishment and amounts to deliberate indifference to his serious medical needs.[4] He alleges that, in addition to being sixty years of age, he has a chronic vitamin D deficiency, which renders him immunocompromised, and suffers from idiopathic balanitis,[5] all of which allegedly renders him more vulnerable to serious illness or death should he contract COVID-19.[6]

Upon receipt of Evdokimow's emergency § 2241 petition, the Court directed the Government to file a response.[7] The Government submitted a timely response and argues that Evdokimow's petition should be dismissed in part and denied in part because: (1) this Court lacks jurisdiction to consider Evdokimow's challenges to his order of removal;[8] (2) under the relevant statutes and binding Supreme Court precedent, his continued detention without a bond hearing is constitutional;[9] and (3) his conditions of confinement do not violate the Constitution.[10] The matter is now ripe for disposition and, for the reasons discussed below, the petition will be dismissed in part and denied in part.

---

[4]   *Id.* at 24-30.
[5]   "Balanitis is inflammation of the glans penis; it is usually associated with phimosis." *Hummer v. Wilkie*, No. 17-1269, 2019 WL 205046, at *2 (Vet. App. Jan. 16, 2019) (internal quotation marks omitted).
[6]   Doc. 1 at 11-12.
[7]   Doc. 2.
[8]   Doc. 3 at 34.
[9]   *Id.* at 35-43.
[10]   *Id.* at 43-58.

### A.    Evdokimow's Removal Proceedings

Evdokimow is a citizen of both Bulgaria and Sweden, and was admitted to the United States in 1992 under a J-1 visa for medical training, before his visa was changed to an O-1 visa in 2000, which permitted Evdokimow to work in the United States as a plastic surgeon.[11] In 2015, Evdokimow was convicted, following a jury trial, of Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371, four counts of Personal Income Tax Evasion, and three counts of Corporate Tax Evasion, all in violation of 26 U.S.C. § 7201.[12] In 2017, the United States District Court for the District of New Jersey sentenced Evdokimow to 36 months' imprisonment.[13] Evdokimow served his term of imprisonment and was released to ICE custody on December 14, 2020.[14]

Prior thereto, on August 24, 2020, the Department of Homeland Security (DHS) issued a Notice of Intent to Issue a FARO against Evdokimow, charging that he was removable as an immigrant convicted of an aggravated felony.[15] DHS ultimately issued the FARO on December 11, 2020.[16] Evdokimow appealed the FARO to the United States Court of Appeals for the Third Circuit, and that court issued a temporary stay of removal on February 3, 2021; that stay is still in place.[17]

---

[11]  *Id.* at 2.
[12]  *United States v. Evdokimow*, 1:14-CR-00601-NLH-1 (D.N.J., ECF No. 84).
[13]  *Id.*, ECF No. 109.
[14]  Doc. 1 at 2.
[15]  Doc. 3-1 at 3-5.
[16]  *Id.* at 11-13.
[17]  Doc. 1 at 3.

Evdokimow is currently confined at York County Prison ("York County") pending his removal from the country.[18]

### B.     Conditions of Confinement

"At York County, detainees are confined in dormitory-style rooms that, in ordinary circumstances, contain fifty detainees, with beds spaced approximately two feet apart."[19] York County has the capacity to house 2,245 individuals and "has historically often operated near capacity."[20] As of the morning of February 19, 2021, however, York County housed only 1,341 individuals.[21]

York County provides detainees with "daily access to sick calls in a clinical setting" as well as "onsite medical staff . . . 24 hours a day, 7 days a week with the ability to admit patients to the local hospital for medical, specialty, or mental health care."[22] Since the start of the pandemic, York County has taken several measures to mitigate the threat of COVID-19 within the facility. During intake, all new detainees are tested for COVID-19 antibodies; any detainees who do "not test positive for COVID-19 antibodies . . . are provided a laboratory nasal swab test."[23] Moreover, during intake medical screenings, detainees are assessed for fever and respiratory illness and are asked whether, in the past fourteen days, they have had close contact

---

[18]  *Id.* at 2.
[19]  *Kilikpo v. Doll*, No. 4:20-CV-00902, 2020 WL 3498172, at *2 (M.D. Pa. June 29, 2020).
[20]  Doc. 3-1 at 68.
[21]  *Id.*
[22]  *Id.* at 71, 73.
[23]  *Id.* at 69.

with a person infected with COVID-19 or have traveled through areas with sustained community transmission.[24]

All arriving detainees are housed within a cohorted[25] section of the prison with other new arrivals and observed for COVID-19 symptoms for a minimum of fourteen days.[26] All detainees who are suspected of being infected with COVID-19 are placed in isolation, where they are tested. If the detainee tests positive for COVID-19, he or she remains isolated and is treated in accordance with Centers for Disease Control and Prevention (CDC) guidelines.[27] If the detainee's condition deteriorates, he or she is referred to a local hospital.[28]

In cases of known exposure to a person with confirmed COVID-19, "asymptomatic detainees are placed in quarantine with restricted movement for the duration of the most recent incubation period (a minimum of 14 days after most recent exposure to an ill detainee, but in most cases lasting up to 21 days) and are monitored daily for fever and symptoms of respiratory illness."[29] During quarantine, detainees are housed with other detainees who were likewise exposed to a person with COVID-19 but who are also asymptomatic.[30] Detainees who develop fever

---

[24] *Id.*
[25] "Cohorting is an infection-prevention strategy which involves housing detainees together who may have or were or could have been exposed to a person with an infectious organism but are asymptomatic." *Id.* at 69-70.
[26] *Id.* at 69.
[27] *Id.*
[28] *Id.*
[29] *Id.* at 70.
[30] *Id.*

and/or respiratory illness are referred to a medical provider for evaluation.[31] Quarantine is discontinued when the 14-to-21-day incubation period completes with no new cases.[32]

York County also provides inmates with soap, water, "hard surface disinfectant, and heavy-duty non-acid washroom cleaner in every housing unit at the prison."[33] Each detainee is issued a bar of soap for use, which is "immediately" replaced upon exhaustion, and "open access to some of approximately 670-bathroom sinks and wash areas within . . . York County . . . for hand washing and personal hygiene."[34] All sinks and wash areas have additional soap available.[35] Hand sanitizer is available for staff but, for security purposes, is not provided to detainees.[36] "High traffic and contact areas . . . are cleaned and disinfected repeatedly throughout the day, at least four times a day. . . . [and s]pray bottles of cleaning solution are kept near every common area phone. Detainees can also ask for cleaning supplies for their room at any time. The facility administration is encouraging both staff and the general population to use these tools often and liberally."[37] Medical personnel

---

[31] *Id.*
[32] *Id.*
[33] *Id.* at 71.
[34] *Id.*
[35] *Id.*
[36] *Id.* The CDC recommends the use of alcohol-based hand sanitizer only "[i]f soap and water are not readily available." Centers for Disease Control and Prevention, *How to Protect Yourself and Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Feb. 22, 2021).
[37] Doc. 3-1 at 72.

"conduct roving temperature checks throughout the facility to monitor for COVID-19 symptoms."[38]

Detainees have been provided protective masks to help prevent the spread of COVID-19:

> All detainees and inmates were first issued surgical masks to wear on or about April 7, 2020. All detainees and inmates were issued a second surgical mask on or about April 14, 2020. Detainees and inmates are required to wear their issued mask anytime they are out of their cell. In all "dormitory" housing areas, detainees and inmates must wear masks when not sleeping. If they can wear the mask while sleeping it is preferred, but not mandatory. The detainee or inmate may remove the mask to eat, take drinks, and to shower. All inmates and detainees must wear their mask during recreation. These surgical masks are made by prison industries workers and are laundered at least once a week. One mask will be placed in their laundry bag and sent out in accordance with the housing unit's normal laundry schedule. All detainees and inmates are not permitted to wash their own masks. Detainees and inmates must follow all directions concerning the donning and doffing of masks. These directions were provided to each inmate when they received their mask. Detainees on isolation status are required to wear a N-95 mask when they leave a cohorted housing unit. . . . Additionally, any detainees being transported to a hospital or outside medical appointment or as directed by . . . medical staff, are required to wear a surgical mask. Detainees and inmates were instructed to wash their hands thoroughly before touching the mask.[39]

Detainees who refuse to wear a mask are removed from their housing unit and placed in an isolated cell.[40]

York County has also taken steps to protect the prison from outside exposure. York County now screens all staff and vendors when they enter the facility,

---

[38] *Id.* at 75.
[39] *Id.* at 74.
[40] *Id.*

including the use of body temperature checks,[41] and requires that all staff or personnel entering the facility wear an N-95 mask and safety glasses or face shields.[42] Any staff or venders who present symptoms of COVID-19 are denied access to York County.[43] York County also offers voluntary COVID-19 testing to staff members.[44] The facility further limits contact between detainees and their visitors by permitting only telephonic or video contact or non-contact legal visits in the facility's visitation room.[45]

Since March 2020, there have been 264 confirmed cases of COVID-19 among ICE detainees at York County.[46] However, as of the morning of February 19, 2021, "there were zero ICE detainees who tested positive for COVID-19 housed in isolation under medical observation consistent with CDC guidelines."[47]

## II.   DISCUSSION

The Government argues that Evdokimow's petition should be dismissed or denied because: (1) this Court lacks jurisdiction to consider Evdokimow's challenges to his FARO;[48] (2) under the relevant statutes and binding Supreme Court

---

[41] *Id.* at 72.
[42] *Id.* at 74.
[43] *Id.* at 72.
[44] *Id.*
[45] *Id.*
[46] *Id.* at 73.
[47] *Id.*
[48] Doc. 3 at 34.

precedent, his continued detention without a bond hearing is constitutional;[49] and (3) his conditions of confinement do not violate the Constitution.[50]

### A. Whether This Court has Jurisdiction to Consider a Challenge to an Order of Removal

First, Evdokimow challenges the legitimacy of his FARO, as he asserts that the FARO was not timely served upon him as required by law and is substantively defective because his offense of conviction does not qualify as an aggravated felony.[51] Regardless of the potential merit of Evdokimow's arguments, the Court concludes that it does not have jurisdiction to consider this claim.

With respect to whether this Court has jurisdiction to consider Evdokimow's challenge to his FARO, "[f]ederal courts are not courts of general jurisdiction" and "have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress."[52] In that respect, the REAL ID Act of 2005 "made petitions for review filed with the court of appeals the 'sole and exclusive means for judicial review of' most orders of removal, . . . [and] expressly eliminated district courts' habeas jurisdiction over removal orders."[53] The relevant statute further provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to

---

[49] *Id.* at 35-43.
[50] *Id.* at 43-58.
[51] Doc. 1 at 16-22.
[52] *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).
[53] *Jordon v. Attorney Gen. of U.S.*, 424 F.3d 320, 326 (3d Cir. 2005) (quoting 8 U.S.C. § 1252(a)(5)).

commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."[54]

In this claim, Evdokimow challenges the FARO and its execution by the Government, including alleged deficiencies in its service.[55] Thus, on its face, the statutory language referenced above divests this Court of jurisdiction to consider Evdokimow's petition as it relates to his challenge to the legitimacy of the FARO. Rather, the appropriate court before which to challenge the FARO is the Third Circuit.[56] Accordingly, Evdokimow's claim related to the validity of his FARO must be dismissed without prejudice.[57]

### B. Whether Evdokimow's Challenge to his Continued Detention Without a Bond Hearing is Premature

Evdokimow next asserts that he should be released from custody because detention beyond the post-removal period is unlawful and constitutes a violation of the Fifth Amendment's Due Process Clause.[58] It is undisputed that the FARO issued to Evdokimow on December 11, 2020 constitutes a final removal order.[59]

The detention of individuals subject to a final removal order is governed by 8 U.S.C. § 1231, which provides that the Government "shall remove the alien from

---

[54]   8 U.S.C. § 1252(g).

[55]   Doc. 1 at 16-22.

[56]   Notably, Evdokimow has filed a challenge to his removal with the Third Circuit. *See Evdokimow v. Att'y Gen. U.S.*, No. 20-2951 (3d Cir. 2020).

[57]   *See Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 119 (3d Cir. 2019) (noting that claims "should be dismissed without prejudice [if] the District Court lack[s] jurisdiction").

[58]   Doc. 1 at 22-24.

[59]   *See id.* at 22-23; Doc. 3 at 35-38.

the United States within a period of 90 days" of, as relevant here, the date the order of removal becomes administratively final."[60] "During the removal period, the [Government] shall detain the alien."[61]

Moreover, in *Zadvydas vs. Davis*,[62] the United States Supreme Court determined that, even after the expiration of the 90-day removal period, the Government may continue to detain an individual for "a period reasonably necessary to bring about the alien's removal from the United States."[63] The Supreme Court determined that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute"[64] and that six months constitutes a "presumptively reasonable period of detention."[65] Thus, if at the conclusion of the six-month period, a detainee provides good reason to believe that there is no significant likelihood of deportation in the reasonably foreseeable future, the burden shifts to the Government to "respond with evidence sufficient to rebut that showing."[66] Only if a court "determine[s] that there is no significant likelihood of removal in the reasonably foreseeable future" is release from custody warranted.[67]

---

[60]  8 U.S.C. §§ 1231(a)(1)(A), (B).
[61]  8 U.S.C. § 1231(a)(2).
[62]  533 U.S. 678 (2001).
[63]  *Id.* at 688.
[64]  *Id.* at 697.
[65]  *Id.* at 701.
[66]  *Id.*
[67]  *Id.*

As Evdokimow acknowledges, the FARO was issued on December 11, 2020, meaning that the 90-day removal period expires on March 11, 2021[68] and, thus, the Government must detain him until that date. Moreover, even if Evdokimow's detention exceeds the ninety-day removal period, his detention may continue for an additional six months, if it is "reasonably necessary" to effectuate removal, or he may be released with applicable conditions of supervision.[69] Because Evdokimow brought this claim before the expiration of the 90-day removal period—and the presumptively reasonable six month removal period established in *Zadvydas*—the petition is premature and must be dismissed without prejudice.[70] Evdokimow may refile this claim should his detention continue beyond the legal detention period.[71]

### C.    Whether Evdokimow's Continued Detention During COVID-19 is Unconstitutional

Finally, the Court turns to Evdokimow's only cognizable claim—his assertion that his continued detention during the COVID-19 pandemic violates the United States Constitution.[72] Specifically, Evdokimow asserts that, because of his age and

---

[68]   *See* Doc. 1 at 23 ("Here, the putative *Final Order* was issued on December 11, 2020. The 90-day removal period will expire on March 11, 2020").

[69]   *Zadvydas*, 533 U.S. at 689.

[70]   *See Guerra v. Doll*, No. 1:20-CV-0594, 2020 WL 4284123, at *2 (M.D. Pa. July 27, 2020) (collecting cases that conclude petitions filed during removal period are premature).

[71]   Even if the Third Circuit's stay of removal effectively stayed the removal period, the Third Circuit has recognized that the "removal period . . . begin[s] when this Court decides [the] petition for review and the stay is lifted" and, accordingly, "any challenge to [a] post-removal order detention is premature" if filed while a stay of removal is in effect. *Taylor v. Att'y Gen. of U.S.*, 241 F. App'x 6, 9 (3d Cir. 2007). Therefore, even if the removal period has not yet begun, Evdokimow's challenge remains premature, given that he has not been in ICE custody beyond the six-month period provided for in *Zadvydas*.

[72]   Doc. 1 at 24-30.

physical conditions, he is more vulnerable to serious illness or death from COVI-19.[73] Those risk factors, combined with Evdokimow's conditions of confinement and Respondents' purported failure to provide safe and adequate housing conditions, allegedly constitute cruel and unusual punishment and deliberate indifference in violation of the Fifth Amendment.[74]

## 1.    Conditions of Confinement

With respect to Evdokimow's claim that conditions at York County violate the Constitution, he must demonstrate that his conditions of confinement "amount to punishment of the detainee."[75] "To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, [the Court] may infer that the purpose of the governmental action is [unconstitutional] punishment."[76] The Third Circuit "further instructs that [courts must] consider the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period of time, and whether conditions are (1) rationally related to their legitimate purpose or (2) excessive in relation to that purpose."[77]

---

[73]   *Id.* at 24-25.
[74]   *Id.* at 25-29.
[75]   *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).
[76]   *E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (internal quotation marks omitted).
[77]   *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 326 (3d Cir. 2020).

In assessing whether a governmental interest is legitimate, the Supreme Court has not "detail[ed] the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention."[78] However, the Supreme Court has recognized that ensuring detainees' presence at hearings, along with "the effective management of the detention facility once the individual is confined" constitute legitimate governmental interests.[79] Similarly, the Government has a legitimate interest in "protecting the public from harm"[80] and "in reducing the flight risk posed by prisoners facing removal."[81]

Viewed under this standard, the Court concludes that Evdokimow's conditions of confinement do not amount to unconstitutional punishment. First, it is beyond cavil that the Government has a legitimate governmental interest in preventing Evdokimow from absconding and avoiding removal and in ensuring that he appears at his removal proceedings. Second, Evdokimow's continued confinement is reasonably related to that legitimate governmental interest, as it guarantees that Evdokimow will attend his deportation proceedings.

Although there are other methods that may help ensure that Evdokimow complies with deportation proceedings, detainment is the only method that guarantees the fulfillment of the Government's goal. Moreover, the relevant question

---

[78] *Bell*, 441 U.S. at 540.
[79] *Id.*
[80] *Hope*, 972 F.3d at 326.
[81] *Builes v. Warden Moshannon Valley Corr. Ctr.*, 712 F. App'x 132, 134 (3d Cir. 2017).

is not whether there are other, less restrictive methods at the Government's disposal, or even whether the Government's chosen course of action is the wisest or best way to proceed.[82] The only limitation on the Government's ability to act is that the chosen course of action be reasonably related to its legitimate goal. Here, that standard is satisfied.

The current conditions at York County do not undermine this conclusion. The Court recognizes that "[p]risons present unique concerns regarding the spread of this virus; by their very nature, prisons are confined spaces unsuited for 'social distancing.'"[83] Nevertheless, CDC guidelines specifically contemplate that individuals will be confined within prisons during the duration of this pandemic.[84] More importantly, conditions no longer resemble the "unsanitary, tightly-packed environments" that led a different court in this District to order the release of ICE detainees.[85] To the contrary, the record reflects that York County has taken proactive

---

[82]   *Cf. Bell*, 441 U.S. at 539 ("Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility"); *Hope*, 972 F.3d at 328 ("We also reject—as contrary to Supreme Court precedent and federal statute—the District Court's view that, because the Government has means other than detention to effectuate the INA's provisions for exclusion or expulsion of aliens, Petitioners' civil detention cannot be rationally related to a legitimate government purpose").

[83]   *Verma v. Doll*, No. 20-CV-14, 2020 WL 1814149, at *4 (M.D. Pa. Apr. 9, 2020).

[84]   *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Feb. 24, 2021).

[85]   *Thakker v. Doll*, 451 F. Supp. 3d 358, 370 (M.D. Pa. 2020).

measures to prevent or limit the spread of COVID-19 within the facility and to ensure the health of its detainees.

First, although York County does not permit the type of social distancing that individuals may undertake in their homes, the facility has removed many detainees and is now operating far below its historical capacity: as of February 19, York County was operating at under sixty percent capacity.[86] Accordingly, there may now only be 30 individuals in a room, rather than 50 as before.

Second, York County is taking significant measures to sanitize the detainees' environment, as well as prevent the introduction or spread of COVID-19 within the facility. All new detainees who enter York County are tested for COVID-19 antibodies, and any detainees who do "not test positive for COVID-19 antibodies . . . are provided a laboratory nasal swab test."[87] Moreover, during intake medical screenings, detainees are assessed for fever and respiratory illness and are asked whether, in the past fourteen days, they have had close contact with a person infected with COVID-19 or have traveled through areas with sustained community transmission.[88]

If a detainee tests positive for COVID-19, he or she remains isolated and is treated in accordance with CDC guidelines.[89] If the detainee's condition deteriorates,

---

[86]   Doc. 3-1 at 68.
[87]   *Id.* at 69.
[88]   *Id.*
[89]   *Id.*

he or she will be referred to a local hospital.[90] In cases of known exposure to a person with confirmed COVID-19, "asymptomatic detainees are placed in quarantine with restricted movement for the duration of the most recent incubation period . . . and are monitored daily for fever and symptoms of respiratory illness."[91] Detainees who develop fever and/or respiratory illness are referred to a medical provider for evaluation.[92] The quarantine is discontinued when the 14-to-21-day incubation period completes with no new cases.[93]

York County also provides inmates with soap, water, and disinfectant.[94] Hand sanitizer is available for staff and high traffic and contact areas are cleaned and disinfected repeatedly throughout the day.[95] York County has provided all inmates with surgical masks that they are to wear at nearly all times, while staff and inmates in isolation must wear N-95 masks.[96] The facility has also taken steps to prevent COVID-19 from entering the facility from outside: all staff and vendors are screened when they enter the facilities, including with body temperature checks, and meetings with visitors are non-contact only.[97]

---

[90] *Id.*
[91] *Id.* at 70.
[92] *Id.*
[93] *Id.*
[94] *Id.* at 71.
[95] *Id.* at 71-72.
[96] *Id.* at 74.
[97] *Id.* at 72.

Third, York County implemented medical procedures to ensure that sick detainees are promptly tested for COVID-19 and, if necessary, quarantined and treated.[98] Moreover, medical staff "conduct roving temperature checks throughout the facility to monitor for COVID-19 symptoms."[99]

The sum of these measures ensures that Evdokimow's conditions of confinement are not unconstitutionally overcrowded or unsanitary. Indeed, the measures have been effective at curbing the introduction or spread of COVID-19 in York County; since the start of the pandemic, there have been 264 cases of COVID-19 among ICE detainees are York County, but as of February 19, there was not a single detainee who was COVID-19 positive, and none were housed in isolation with a suspected case of COVID-19.[100]

Even courts that previously determined that the conditions of confinement at York County violated the Fifth Amendment have reconsidered in light of new procedures put in place since the beginning of the pandemic, emphasizing that "[c]onsidering the drastic changes put into effect at [York County], and the evidence that they are able to effectively control transmission from COVID-positive inmates, . . . the improved conditions therein do not negate the Government's legitimate interest in detention."[101]

---

[98]  *Id.* at 69.
[99]  *Id.* at 75.
[100]  *Id.* at 73.
[101]  *Thakker v. Doll*, 456 F. Supp. 3d 647, 657 (M.D. Pa. 2020).

The Court's decision today is also in accord with a decision of the Third Circuit in August 2020 that vacated a district court's determination that conditions of confinement at York County were unconstitutional.[102] In that decision, the Third Circuit analyzed conditions at York County that, at the time, were similar to the conditions as they exist today, although arguably less safe because the facility did not have the ability to test all new incoming detainees.[103] After reviewing those conditions, the Third Circuit determined that, "[c]onsidering all the responsive measures specifically implemented to detect and to prevent spread of the virus, the challenges of facility administration during an unprecedented situation, and the purposes served by detention—Petitioners did not show a substantial likelihood of success on their claim that the conditions of their confinement constitute unconstitutional punishment."[104]

In sum, the record reflects that detainees at York County receive adequate protection from COVID-19. Moreover, Evdokimow's detention is reasonably related to several of ICE's legitimate goals, and his conditions of confinement therefore do not amount to punishment in violation of the Constitution. Accordingly, Evdokimow's claim related to his conditions of confinement will be denied.

---

[102] *Hope*, 972 F.3d at 317-19.
[103] *See id.* at 327-28 (detailing conditions of confinement at York County as of August 2020).
[104] *Id.* at 329.

### 2.    Deliberate Indifference

Although it is not entirely clear from his petition, it is possible that Evdokimow is attempting to raise a claim for deliberate indifference to his medical needs.[105] The Constitution "prohibits any punishment which violates civilized standards and concepts of humanity and decency."[106] When applied to allegations of inadequate medical care, prison officials violate the Fifth Amendment "when they exhibit deliberate indifference to serious medical needs of prisoners."[107] That "standard requires deliberate indifference on the part of prison officials and [that] the prisoner's medical needs be serious."[108] As to the serious medical needs requirement, "[t]he detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death."[109]

Deliberate indifference is demonstrated where "the custodial officials 'knew or should have known' of [a] strong likelihood" of unnecessary suffering, injury, or death.[110] Thus, "there can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize [such] high risk"[111] "Therefore, the 'should have known' element . . .

---

[105]  *See* Doc. 1 at 26 (noting that prisons must provide detainees with medical care); *id.* at 29 (asserting that Respondents have acted with deliberate indifference).

[106]  *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (internal quotation marks omitted).

[107]  *Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (internal quotation marks omitted).

[108]  *Id.* (brackets, ellipsis, and internal quotation marks omitted).

[109]  *Id.*

[110]  *Id.*

[111]  *Id.*

connotes something more than a negligent failure to appreciate the risk . . . presented [to] a particular detainee, though something less than subjective appreciation of that risk."[112] "[T]he risk of . . . injury must not only be great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges."[113]

In light of the measures that York County has taken to protect its detainees, the Court concludes that Evdokimow has failed to establish that prison officials have exhibited deliberate indifference to his medical needs. Although COVID-19 presents a serious medical issue, as detailed above, the facility has taken significant steps to curb the introduction or spread of COVID-19 and to contain and treat those who may become infected with the virus. The Court again notes that, as of February 19, 2021, there was not a single detainee at York County who was infected with COVID-19 or in isolation for a suspected COVID-19 infection.[114]

Those safety measures—and their efficacy—demonstrate that York County recognizes the significant threat that COVID-19 poses to its detainees and has taken responsible steps to protect them. Under such circumstances, it cannot be said that Respondents have been deliberately indifferent to Evdokimow's health, safety, or medical needs, and there certainly is no "evidence [of] an absence of any concern

---

[112] *Id.*
[113] *Id.*
[114] Doc. 3-1 at 73.

for the welfare of [York County's] charges."[115] To the contrary, York County has "quickly and effectively implemented the guidelines published by the CDC such that [it has] stymied any potential outbreak within [its] walls . . . and [any COVID-19 outbreak at York County] appears to have been effectively contained."[116] As another colleague in this District aptly stated in a recent opinion: "There is no perfect solution to preventing the spread of COVID-19 in detention facilities, but York County Prison officials have taken reasonable steps to limit the spread throughout its facility. [Petitioner therefore] has not established a conscious disregard for the risk posed by COVID-19."[117]

Of perhaps equal significance to the steps that York County has taken in response to the pandemic is the fact that there is no evidence that Evdokimow's medical "condition [is] such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death."[118] Evdokimow is sixty years of age and, while the risk of illness or death from a COVID-19 infection increases with one's age, Evdokimow's age does not put him with the group of especially vulnerable individuals, which is generally considered to start around the age of 65.[119]

---

[115] *Woloszyn*, 396 F.3d at 320.
[116] *Thakker*, 456 F. Supp. 3d at 660.
[117] *Verma*, 2020 WL 1814149, at *6.
[118] *Woloszyn*, 396 F.3d at 320.
[119] *See Coronavirus Disease 2019 (COVID-19): People at Increased Risk, Older Adults*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Feb. 24, 2021) (noting that risk of death rises markedly at the age of 65, with the risk of death being 1,100 times higher than it is for individuals between the ages of 5 and 17).

Moreover, although Evdokimow asserts that he suffers from a Vitamin D deficiency and balanitis,[120] there is no evidence in the record that these conditions increase the risk posed to Evdokimow by COVID-19, and the CDC does not list these conditions as ones that place an individual at an increased risk from the virus.[121] In the absence of any underlying condition that would render Evdokimow especially susceptible to serious complications from COVID-19, it is difficult to conclude that he is at serious medical risk, let alone that Respondents have been deliberately indifferent to that risk. Accordingly, any claim for deliberate indifference must also be denied.

## III.   CONCLUSION

For the foregoing reasons, Evdokimow's 28 U.S.C. § 2241 petition will be dismissed in part and denied in part.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
United States District Judge

---

[120]   Doc. 1 at 25.

[121]   *See Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Feb. 24, 2020).